UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

REBECCA ANN K.,[1]

                              Plaintiff,

v.                                                          **DECISION AND ORDER**

COMMISSIONER OF SOCIAL SECURITY,                    1:22-cv-0069(JJM)

                              Defendant.

_____

       This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of the Commissioner of Social Security that plaintiff was not entitled to disability insurance benefits ("DIB") or supplemental security income ("SSI") benefits. Before the court are the parties' cross-motions for judgment on the pleadings [9, 10].[2] The parties have consented to my jurisdiction [14]. Having reviewed their submissions [9, 10, 11], plaintiff's motion is granted.

## BACKGROUND

       The parties' familiarity with the 1,435-page administrative record [6] is presumed. Further, the parties have comprehensively set forth in their papers plaintiff's treatment history and the relevant medical evidence. Accordingly, I refer only to those facts necessary to explain my decision.

---

[1]      In accordance with the guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Western District of New York on November 18, 2020 in order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff by first name and last initial.

[2]      Bracketed references are to the CM/ECF docket entries. Page references to the administrative record are to the Bates numbering. All other page references are to the CM/ECF pagination.

Plaintiff filed her application in September 2015, alleging a disability beginning on September 9, 2015, due to manic depression, depression, and anxiety.  Id. at 186, 217, 221. This matter was previously remanded pursuant to a Decision and Order from this court.  Id. at 835-850 (Case Number 1:19-cv-0856-LJV).

The court instructed the Commissioner, upon remand, to "consider and specifically address the impact of [plaintiff's] response to stress on her ability to work".  Id. at 848.  The court also instructed:

> "The ALJ also must adequately justify any reliance on the state consultant over [plaintiff's] treating mental health professionals and, to the extent she still gives substantial weight to the consultant's opinion, consider – and either incorporate or explain her reasons for rejecting – his recommended limitations in various functioning domains.  And if the ALJ finds Ms. Pay's or NP Taber's opinions vague, she should ask them for more detailed and precise statements."

Id. at 848.  Thereafter, ALJ Paul Georger held an administrative hearing on July 15, 2021.  Id. at 765-803 (transcript of hearing).  Plaintiff, who was represented by an attorney, testified along with a vocational expert.  Id. at 771-802.

Plaintiff's primary arguments are that ALJ Georger failed to follow the court's instructions by failing to "adequately justify his reliance on the state consultant opinion over plaintiff's treatment providers" and failed to address the impact of plaintiff's stress on her ability to work.  Plaintiff's Memorandum in Support [9-1] at 19-28.

## ALJ GEORGER'S DECISION

On September 29, 2021, ALJ Georger issued a decision concluding that plaintiff was not disabled.  Id. at 742-757.  To reach that determination, ALJ Georger found that plaintiff's severe impairments were degenerative disc disease of the lumbar spine, osteoarthritis

of the bilateral hips, asthma, major depressive disorder, generalized anxiety disorder, bipolar

disorder, and posttraumatic stress disorder ("PTSD"). Id. at 744-45.[3] He found plaintiff had the

residual functional capacity ("RFC") to perform light work, with additional physical and non-

exertional limitations, plus the following limitations related to her ability to perform mental

functions required for work:

> "[C]laimant has the residual functional capacity to perform light
> work . . . except she . . . is able to perform simple, routine and
> repetitive tasks; is able to perform simple work-related decisions;
> is able to interact with supervisors occasionally; is able to interact
> with coworkers occasionally; is able to interact with the public
> occasionally; is able to tolerate few changes in a routing work
> setting, defined as occasional changes to the worksite and routine."

Id. at 747.

## OPINION AND OTHER EVIDENCE

To support his RFC findings concerning limitations related to plaintiff's mental

health conditions, ALJ Georger considered opinions concerning from several sources: 1)

consultative examiner Gina Zali, Psy.D.; 2) consultative examiner Christine Ransom, Ph.D.; 3)

state agency psychological consultant O.[4] Austin-Small, Ph.D.; 4) Faye Taber, PMHNP; and 5)

Tracey E. Reed[5], LCSW. Id. at 752-54. ALJ Georger relied primarily upon the opinions of

psychological consultants Dr. Austin-Small (id. at 100-101), who did not examine plaintiff, and

Dr. Ransom (id. at 1342-46), who examined plaintiff on one occasion but did not review her

treatment records. He assigned their opinions "substantial weight". Id. at 752. However,

---

[3]     Plaintiff does not challenge these findings.

[4]     Dr. Austin-Small's first name does not appear in the record.

[5]     LCSW Reed's last name changed in 2020 from "Pay" to "Reed". See e.g. [6] at 1289-1304. For
consistency, I shall refer to her herein as LCSW Reed.

because plaintiff's arguments, and therefore my analysis, concern primarily the ALJ's treatment of the opinions of PMHNP Taber and LCSW Reed, I will focus on those opinions below.

## A.        Letters from NP Taber and LCSW Reed

The record contains letters from plaintiff's treating psychiatric Nurse Practitioner, Fay E. Taber, dated October 16, 2015, and March 24, 2016.  Her October 16, 2015 letter states that she has been treating plaintiff for "over one year" and that plaintiff is "receiving ongoing treatment" for "major depressive disorder and generalized anxiety disorder".  Id. at 339.  She stated that plaintiff's "condition is such that it impairs her ability to stay on task when conditions are less than favorable (e.g. noise/distractions), due to emotional distress and anxiety that may not be readily observable by others" and that her "symptoms have been ongoing".  Id.  She updated plaintiff's diagnosis in her March 24, 2016 letter, stating that plaintiff was under her care "for Bipolar I disorder".  Id. at 338.  She stated that plaintiff's "episodes are mixed and are moderate to severe intensity, interfering with her ability to optimally function in a work environment".  Id.  She was treating plaintiff "with a combination of medication and psychotherapy to help her manage her symptoms".  Id.

The record also contains a letter from plaintiff's treating licensed clinical social worker, Tracey Reed, dated December 12, 2017.  She states that plaintiff "has been receiving outpatient mental health treatment through this clinic since 6/3/16" and that plaintiff's current diagnosis is "Bipolar [Disorder], recent episode mixed".  Id. at 536.  She stated plaintiff was "receiving psychiatric care through Dr. Faye Tabor" and taking prescription psychiatric medications.  Id.  She stated that plaintiff "is compliant with all appointments, however, she continues to exhibit chronic anxiety, panic and episodic depression which can last for days".  Id.

She states that plaintiff "has not been able to work as a result of her symptoms".  Id.  She

concludes:

> "Although [plaintiff] has shown some improvement in being able
> to maintain a degree of functioning at home, this is a struggle for
> her. She requires frequent monitoring of her illness.  It is my
> clinical opinion, that as she displays a high vulnerability to stress,
> she would not be able to function adequately in a work
> environment as this could exacerbate her symptoms and most
> likely result in decompensation of her illness and hospitalization."

Id.

ALJ Georger gave "little weight" to these assessments.  He found they were

"somewhat vague, lacking specificity as to the degree to which the claimant could or could not

perform particular mental work-related activities during the course of a normal work schedule,

and somewhat conclusory, relating to the issue of disability reserved to the Commissioner."  Id.

at 754.  He concluded that "the disabling degree of restrictions suggested by Ms. Taber and Ms.

[Reed] is simply not supported by, or consistent with, the substantial evidence of record detailed

above".  Id.

**B.      Mental Residual Functional Capacity Questionnaire by LCSW Reed**

LCSW Reed included more specific functional opinions in a June 9, 2021 Mental

Residual Functional Capacity Questionnaire.  Id. at 1417-21.  The form she completed defines

"seriously limited" and "unable to meet competitive standards":

> "*Seriously limited* means ability to function in this area is seriously
> limited and would frequently be less than satisfactory in any work
> setting."

> "*Unable to meet competitive standards* means your patient cannot
> satisfactorily perform this activity independently, appropriately,
> effectively and on a sustained basis in a regular work setting."

Id. at 1419.

- 5 -

She stated that plaintiff is "seriously limited" in her ability to "[m]aintain

attention for two hour segment[s]" and "unable to meet competitive standards" in her ability to:

- "Work in coordination with or [in] proximity to others without being unduly distracted";

- "Complete a normal workday and workweek without interruptions from psychologically based symptoms";

- "Perform at a consistent pace without an unreasonable number and length of rest periods"; and

- "Deal with normal work stress".

Id. at 1419.  She also opined that plaintiff's impairments or treatment would cause her to be

absent from work more than four days per month.  Id. at 1421.

ALJ Georger gave this opinion "little weight".  He explained that "[t]he rather

profound and extreme degree of restriction reflected in Ms. Reed's questionnaire finds little

support in, and is inconsistent with, the substantial evidence of record, as discussed above, which

typically reflects no more than moderate findings upon mental status exam with fairly routine

and conservative management."  Id. at 754.

## ANALYSIS

### A.    Standard of Review

"A district court may set aside the Commissioner's determination that a claimant

is not disabled only if the factual findings are not supported by 'substantial evidence' or if the

decision is based on legal error."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42

U.S.C. § 405(g)).  Substantial evidence is that which a "reasonable mind might accept as

adequate to support a conclusion".  Consolidated Edison Co. of New York. Inc. v. NLRB, 305

U.S. 197, 229 (1938).  It is well settled that an adjudicator determining a claim for DIB and/or

SSI employs a five-step sequential process.  Shaw, 221 F.3d at 132; 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff bears the burden with respect to steps one through four, while the Commissioner has the burden at step five.  *See* <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d. Cir. 2012).

**B.      ALJ Georger's RFC Is Not Supported by Substantial Evidence**

It is well settled that the RFC need "not perfectly correspond with any of the opinions of medical sources cited in his decision" and an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole". <u>Matta v. Astrue</u>, 508 Fed. Appx. 53, 56 (2d Cir. 2013) (Summary Order). *See also* <u>Young v. Berryhill</u>, 2018 WL 2752443, *2 (W.D.N.Y. 2018) ("[i]t is well settled that an ALJ need not adopt one or more medical opinions verbatim in order to render a sufficiently-supported RFC determination").  "The question is, instead, whether the ALJ's conclusion was 'supported by the record as a whole.'" <u>Nieves v. Commissioner of Social Security</u>, 2019 WL 4565112, *4 (S.D.N.Y. 2019) (*quoting* <u>Tricarico v. Colvin</u>, 681 Fed. Appx. 98, 101 (2d Cir. 2017) (Summary Order)).

For cases filed before March 27, 2017[6], opinions from treating sources who are not physicians or psychologists – like the opinions at issue here – are evaluated using the factors listed in 20 C.F.R. §§404.1527(c)(2).  20 C.F.R. §404.1527(f).  An ALJ "should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case". <u>Id.</u>  "The ALJ must consider, *inter alia*, the '[l]ength of the treatment relationship and the frequency of examination'; the '[n]ature and extent of the treatment relationship'; the 'relevant

---

[6]      Plaintiff filed her claim on September 25, 2015.  Administrative Record [6] at 186.

evidence . . . particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (*citing* 20 C.F.R. §404.1527(d), now (c)).

Where an ALJ discounts the opinion of a treating source who is not a physician, he or she must explain the reasons for that finding.  "While the opinions of consulting and examining physicians and non-acceptable medical sources are not entitled to controlling weight, in the absence of a controlling treating physician opinion, such opinions take on particular significance. . . . In such circumstances, an ALJ must consider opinions by each of these sources using the same factors that are typically used to evaluate the opinions of treating physicians . . . and must explain in his decision the weight given to each and the reasons therefor."  Montanez v. Berryhill, 334 F.Supp.3d 562, 564 (W.D.N.Y. 2018).

The Second Circuit has "frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination. . . . This concern is even more pronounced in the context of mental illness where, as discussed above, a on-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."  Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019).

An ALJ is "duty-bound to review all of the evidence before her, resolving inconsistencies, and make a disability determination that is consistent with the evidence as a whole".  Rice v. Commissioner, 2020 WL 4283894, *4 (W.D.N.Y. 2020).  Where an ALJ's decision "gives no clue" how the RFC "accommodates or takes into account . . . moderate mental limitations", the ALJ's findings at steps 4 and 5 of the sequential analysis are "unsupported by substantial evidence".  Reynolds v. Colvin, 2014 WL 4184729, *5 (N.D.N.Y. 2014).  The ALJ is

required "to construct an accurate and logical bridge between his recitation of the facts and the conclusions he reached". Lopez obo Y.T. v. Commissioner of Social Security, 2020 WL 4504987, *2 (W.D.N.Y. 2020).

Plaintiff argues that ALJ Georger failed to do that, most significantly concerning his analysis of her treating providers' opinions, the time that plaintiff might be off-task or absent from work due to her mental health conditions, and her ability to handle stress. Plaintiff's Memorandum of Law [9-1] at 21-30. She argues further that ALJ Georger's analysis of LCSW Reed's opinion is deficient because he offered only conclusory statements concerning the supportability and consistency of the opinion evidence, and did not explain his opinions with specific citations to the other opinions or to the record. Id. at 25-26. For the reasons below, I agree, and remand this matter to the Commissioner for further proceedings.

ALJ Georger states in his analysis of the letters from both NP Taber and LCSW Reed that "the disabling degree of restrictions suggested by [them] is not supported by, or consistent with, the substantial evidence of record detailed above". Administrative Record [6] at 754. In his analysis of LCSW Reed's Mental Residual Functional Capacity Questionnaire, he states that the "rather profound and extreme degree of restriction reflected in LCSW Reed's questionnaire finds little support in, and is inconsistent with, the substantial evidence of record, as discussed above, which typically reflects no more than moderate findings upon mental status exam with fairly routine and conservative management". Id.

These types of conclusory statements during analysis of opinion evidence can be sufficient where the opinion includes a robust discussion of a plaintiff's treatment records, with specific citation to the administrative record. See e.g. Ronald T. W. v. Commissioner, 2025 WL 1899361, *4-5 (W.D.N.Y. 2025). However, the opinion at issue here does not include a robust

analysis of plaintiff's treatment records. Instead, ALJ Georger discusses five of plaintiff's

mental health treatment records over the course of a record containing many years of treatment

notes and summarizes the rest:

> "[M]edical records document treatment for the claimant's issues
> with mood disturbance and PTSD symptomatology, but typically
> show no more than moderate mental status findings, fairly stable
> symptoms, and adequate mentation with routine treatment with
> therapy and medications at different times including Zoloft,
> gabapentin, Lamictal, Abilify, and Xanax."

Id. at 748. ALJ Georger then summarily cites nearly 300 pages of medical records, spanning

thirteen years of treatment, with no pinpoint cites. Id. (*citing* "Exhs. 1F, 3F-4F, 6F-7F, 11F, 14F,

19F-21F; 24F-26F; 31F-32F" corresponding to Administrative Record [6] at 289-306, 313-18,

331-39, 442-72, 535-36, 687-738, 1085-166, 1284-1350, 1395-435).

The treatment records addressed by ALJ Georger are dated January 26, 2017,

February 26, 2018; October 20, 220; December 30, 2020; and May 11, 2021. Id. at 749-51. In

addition, he addressed an October 20, 2020 treatment note in her primary physician's records

concerning her mental health symptoms. NP Taber treated Plaintiff on January 26, 2017. Id. at

690, 749. ALJ Georger noted that plaintiff reported "severe mood swings, in the context of

recently stopping her medications after reading about potential side effects on the internet and

experiencing somatic complaints". Id. Plaintiff asked to re-start her medications. Id. NP Taber

recorded plaintiff's "poor insight, impaired judgment, [ ] poor impulse control, and impaired

remote memory, but also appropriate dress, cooperative behavior normal psychomotor activity,

euthymic mood, goal-directed, intact recent memory, intact attention/concentration, and normal

gait/station, muscle strength, and tone." Id. at 749. Plaintiff was "reinitiated on a carbamazepine

regimen". Id. NP Taber increased the dose of this medication from plaintiff's previous visit. *See*

id. 694 (200 mg tablet discontinued and 300 mg tablet ordered). In addition, this medication represented a change from her medication prescribed on June 27, 2016 (clonazepam). Id. at 697.

ALJ Georger then jumped to plaintiff's February 26, 2018 visit with LCSW Reed. He noted that LCSW Pay described plaintiff's progress as "fair" and "steady". Id. at 750, 1326. Plaintiff reported "struggling appropriately with current stressors and expressing some relief about ways she and her husband were dealing with family issues". Id. She expressed "ongoing temper issues and worry about [a] possible manic cycle". Id. Her mental status examination revealed a "mildly anxious mood and coherent but pressured speech, with otherwise relevant and spontaneous conversation, and good insight and judgment". Id.

ALJ Georger next considered an October 20, 2020 treatment note from plaintiff's primary treating nurse practitioner, Patricia Wagner, who saw plaintiff that day for a physical via video, due to the pandemic. See id. at 750, 1199. Plaintiff reported feeling stressed about family members' health. Id. She indicated that her "moods were not quite stable and that she experienced palpitations associated with anxiety". Id. NP Wagner stated that plaintiff "denied significant anxiety, depression, or other psychiatric symptoms" and displayed "normal demeanor and mental status". Id. ALJ Georger did not include plaintiff's statement that she "last saw psychiatry at DENT in August . . . and that they are moving her medications around a little bit". Id. at 1199.

ALJ Georger also does not include any discussion of the treatment note from the August 5, 2020 Dent visit referred to by NP Wagner. At that visit, plaintiff completed both a Patient Health Questionnaire ("PHQ-9") and a Generalized Anxiety Disorder 7 ("GAD-7") questionnaire. Id. at 1091. Her scores indicated she was experiencing severe levels of depression and anxiety. Id. She reported "feeling quite restless and almost manic at times",

"ongoing difficulties with social isolation and social anxiety", and "that she hates to leave her home". Id. at 1092. She "no longer goes for walks outside as she does not want to run into anyone", and "even misses family functions". Id. Her provider continued two of her medications, but discontinued another. Id. at 1093.

Instead, ALJ Georger considered a December 30, 2020 treatment note from LCSW Reed. Id. at 751. That note "indicated good progress and assigned the claimant a Global Assessment of Functioning [("GAF")] score of 65-70, suggesting only mild symptomatology or some difficulty in functioning. Ms. [Reed] also noted engaged and cooperative behavior." Id. Although ALJ Georger accurately reported the GAF score written on the form, it is not clear that LCSW Reed "indicated good progress". At best, LCSW Reed's finding on plaintiff's progress is ambiguous. LCSW Reed indicated plaintiff's progress on a pre-printed portion of the form by drawing a circle that encompassed portions of both the words "fair" and "good":



Id. at 1286. The substantive portions of her note are handwritten and largely illegible, but do not appear to explain in any detail the basis for the GAF score she assigned. "[T]he Social Security Administration has explained that 'unless a clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.' U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication". Estrella, 925 F.3d at 97 (internal alterations omitted).

ALJ Georger then skipped to a May 11, 2021 Dent treatment note.  Id. at 751, 1397.  Her provider "noted that at the claimant's last visit in March 2021, no changes had been made in her medications due to stability".  Id.  He stated that the provider "characterized the claimant's psychiatric conditions as relatively stable and recommended continuing the same medication regimen".  Id.  Plaintiff was unsure at the time of the effectiveness of her medications, but did not wish to make any medication changes at the time.  Id. ALJ Georger did not acknowledge that, notwithstanding those notes, plaintiff and her provider discussed increasing the dose of one of her depression medications "if mood is persistently low" and changing one of her anxiety medications from "as needed to twice daily . . . at a higher dose". Id. at 1399.

ALJ Georger's conclusory statements about plaintiff's mental health records are suspect.  For example, he characterized her symptoms as "stable" and her treatment with medications as "routine".  Id. at 748.  But plaintiff's providers at Dent, who managed her psychiatric medications beginning in July 2018, characterized her bipolar disorder as both "severe" and "treatment resistant".  Id. at 1153.

At her July 12, 2018 visit, Horacio Capote, M.D. added Abilify as a medication in addition to the Zoloft she was already taking.  He also discussed with plaintiff "electroconvulsive therapy as a method of treating her very refractory bipolar depression". Id.  Dr. Capote and other treatment providers at Dent then prescribed changes to plaintiff's psychiatric medications fourteen times over the next three years to treat recurrent symptoms of her bipolar and anxiety disorders.  The providers at Dent also continued to recommend electroconvulsive therapy ("ECT") and intravenous Ketamine treatment.  See id. at 1148 (8/7/2018 restart Abilify, discontinue Xanax, recommend ECT); 1142 (8/28/2018 prescribe Lamictal and Seroquel in

addition to Zoloft, discontinue Abilify and Xanax, recommend ECT); 1137 (9/20/2018 increase

dose of Zoloft; recommend ECT); 1132 (10/15/2018 increase dose of Zoloft; recommend ECT);

1122 (3/11/2019 increase dose of Lamictal); 1112 (9/5/2019 increase dose of Lamictal, discussed

adding Wellbutrin); 1107 (12/5/2019 added Vraylar "to improve [plaintiff's] bipolar depression,

discussed adding ECT to plaintiff's medication regiment, encouraged plaintiff to increase the

frequency of her psychotherapy appointments to twice monthly); 1102 (1/20/2020 substituted

Cymbalta for Zoloft, discussed ECT and Ketamine, "[t]he patient and I are both currently not

satisfied with the level of progress and function displayed so far"); 1097 (6/25/2020 Vraylar

restarted to "further stabilize [plaintiff's] bipolar depression" and Cymbalta dose increased "to

further improve depression and anxiety"); 1093 (8/5/2020 Seroquel discontinued; Vraylar

discontinued due to lack of benefit and side effects; Lamictal and Cymbalta continued; discussed

adding Ketamine); 1089 (9/24/2020 Cymbalta discontinued, Zoloft restarted, Gabapentin started

"for better anxiety control"); 1405 (2/15/2021 Abilify added "to bring the patient closer to

remission from symptoms of bipolar depression", Zoloft and Gabapentin continued due to

plaintiff's "relative stability with regards to anxiety").

As the Seventh Circuit has noted, a "person who has a chronic disease . . . and is

under continuous treatment for it with heavy drugs, is likely to have better days and worse days .

. . Suppose that half the time she is well enough that she could work, and half the time she is not.

Then she could not hold down a full-time job. . . . That is likely the situation of a person who has

bipolar disorder that responds erratically to treatment." Bauer v. Astrue, 532 F.3d 606, 609 (7th

Cir. 2008).

Further, plaintiff's records document periods of deterioration, which the five

treatment notes discussed by ALJ Georger did not reflect. For example, plaintiff's PHQ9 and

GAD-7 scores on June 6, 2019 indicated only mild levels of depression and anxiety.  Id. at 1114.

She reported to her provider at Dent that things were "going quite well lately" and that she had

noticed" significant improvement in her mood since her last appointment".  Id.

       At her next visit on September 5, 2019, her PHQ9 score indicated a "moderately

severe" level of depression and her GAD-7 score indicated a "SEVERE level of anxiety".  Id. at

1109 (emphasis in original).  Plaintiff was having a "great deal of difficulty with apathy, fatigue,

and self-care".  Id.  She stated that she stays in bed most days, and doesn't shower.  Id.  Other

times she felt "amped up and get[s] very irritable" and also experienced "periods of increased

energy".  Id.  Her medication dosage was changed and her provider discussed adding an

additional drug to her regimen.  Id. at 1112.

       Plaintiff's depression was still considered "severe" on January 20, 2020 when she

visited Dr. Capote at Dent.  Id. at 1100.  Her provider adjusted her medications and "discuss[ed]

treatment resistant depression and [its] interventional treatment with ECT, and Ketamine".  Id. at

1102.  He stated that "[t]he patient and I are both currently not satisfied with the level of progress

and function displayed so far".  Id.

       Further, ALJ Georger concludes the records show "fairly stable symptoms" and

"routine treatment".  While plaintiff had periods of improvement and relative stability, her

provider defined this as simply "not deteriorating".  Id. at 1124 (1/3/2019 "[a]lthough not in

remission, this patient's condition is stable under the current regiment & not deteriorating");

1122 (3/11/2019 "[w]e are making adjustments to bring the patient closer to remission from

symptoms of depression"); 1117 (6/6/2019 "[a]lthough not in remission, this patient's condition

is stable under the current regiment & not deteriorating"); 1102 (1/20/2020 with respect to

plaintiff's anxiety her medication was continued as prescribed "[d]ue to patient's stability", but

both the plaintiff and her provider were "not satisfied with the level of progress and function

displayed so far" with respect to her bipolar depression, and medication changes continued).

   "It is a fundamental tenet of Social Security law that an ALJ cannot pick and

choose only parts of a medical opinion that support his determination".  Nix v. Astrue, 2009 WL

3429616, *6 (W.D.N.Y. 2009).  "In effect, [the ALJ] 'cherry picked' the evidence, relying on

some statements to support his conclusion, while ignoring other substantive detail to the contrary

from the same sources. This, however, does not satisfy a substantial evidence standard. While

ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence

that supports a particular conclusion."  Royal v Astrue, 2012 WL 5449610, *6 (N.D.N.Y. 2012),

adopted, 2012 WL 5438945 (N.D.N.Y. 2012).  "Cycles of improvement and debilitating

symptoms of mental illness are a common occurrence, and in such circumstances it is error for

an ALJ to pick out a few isolated instances of improvement over a period of months or years and

to treat them as a basis for concluding a claimant is capable of working".  Estrella, 925 F.3d at

97.

   I "cannot divine the bases for the ALJ's conclusions".  Canales v. Commissioner,

698 F.Supp.2d 335, 343 (E.D.N.Y. 2010).  Here, ALJ Georger did not discuss the treatment

records that demonstrated deterioration in plaintiff's condition, the long history of changes to her

potent psychiatric medications, or her provider's recommendations for more drastic treatment,

including ECT and intravenous Ketamine.  See Dennis v. Berryhill, 2018 WL 48892, *4

(W.D.N.Y. 2018) (contrasting "drastic" treatments, including electroconvulsive therapy, with

more conservative treatments, such as cognitive behavioral therapy).  Nor did he discuss how

each of these might affect plaintiff's ability to function in a work setting or to maintain regular

attendance.  Instead, he characterized plaintiff's treatment records broadly as "typically

show[ing] no more than moderate mental status findings, fairly stable symptoms, and adequate mentation with routine treatment with therapy and medications at different times". [6] at 748. Further, he assigned "little weight" to the functional opinion of LCSW Reed, concluding that "[t]he rather profound and extreme degree of restriction reflected in Ms. Reed's questionnaire finds little support in, and is inconsistent with, the substantial evidence of record, as discussed above, which typically reflects no more than moderate findings upon mental status exam with fairly routine and conservative management".  Id. at 754.

       Although there may be substantial evidence in this record to support ALJ Georger's treatment of LCSW Reed's and NP Taber's opinions, he has not explained how he resolved the conflicting evidence in the record.  He has not, therefore, satisfied his obligation to "ensure that the discussion of the evidence . . . allows a claimant or a subsequent reviewer to follow" his reasoning to discount them.  20 C.F.R. §404.1527(f); *see also* Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019) ("[t]he ALJ made no attempt to 'reconcile' or 'grapple with' the apparent longitudinal inconsistencies in [plaintiff's] mental health . . . . When viewed alongside the evidence of the apparently cyclical nature of [plaintiff's] depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimizing Dr. Dron's opinion").  An ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given *denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record".  Beck v. Colvin, 2014 WL 1837611, *9 (W.D.N.Y. 2014) (emphasis in original).

       A second remand is therefore required to enable the ALJ to explain how he resolved the conflicting evidence in the record, and to reconsider his treatment of the opinion

evidence in the context of that analysis.  As District Judge Vilardo stated in his August 4, 2020 opinion:

> "The ALJ also must adequately justify any reliance on the state consultant over [plaintiff's] treating mental health professionals and, to the extent [he] still gives substantial weight to the consultant's opinion, consider – and either incorporate or explain [his] reasons for rejecting – his recommended limitations in various functioning domains.  And if the ALJ finds [LCSW Reed's] or NP Taber's opinions vague, [he] should ask them for more detailed and precise statements."

[6] at 848.

Because I am remanding this matter for further administrative proceedings, I do not reach plaintiff's remaining arguments.  *See* <u>Shaine J. v. Commissioner of Social Security</u>, 2020 WL 68887622, *5 (W.D.N. Y. 2020).

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment on the pleadings [9] is granted to the extent that this matter is remanded to the Commissioner for further proceedings consistent with this Decision and Order, and the Commissioner's motion for judgment on the pleadings [10] is denied.

**SO ORDERED**.

Dated: August 13, 2025

/s/    Jeremiah J. McCarthy<br>JEREMIAH J. MCCARTHY<br>United States Magistrate Judge